**PAINTER et al. v. SOUTHERN TRANSP. CO.**

**Clv. Nos. 315, 316, 317.**

United States District Court
E. D. Virginia, Norfolk Division.

May 4, 1948.

See also D.C., 80 F.Supp. 756.

R. Arthur Jett, of Norfolk, Va., for plaintiffs.

Leon T. Seawell, of Norfolk, Va., for defendant.

HUTCHESON, District Judge.

1. During the times mentioned herein, the defendant owned and operated the ocean-going steam tug "Menominee", a vessel documented under the laws of the United States, 150 feet long, having a beam 28 feet and a depth of 16 feet.

2. On March 17, 1942, prior to the sailing of the "Menominee" on a voyage preceding that on which the disaster occurred, the tug was inspected at Norfolk, Virginia, by the Bureau of Marine Inspection and Navigation, who required that before sailing, the tug should provide: "sufficient life raft or life float capacity (approved raft) to accommodate all persons. Raft to be equipped as per Regulations". At that time the tug was not equipped with an approved life raft or life float as contemplated by existing regulations, which provided as follows: "C. Towing vessels, manned barges, and miscellaneous craft—(1) Life Rafts. Towing vessels, manned barges, and miscellaneous craft shall carry sufficient lifeboats to accommodate all persons on board. In addition, approved rafts to accommodate all persons on board shall be carried: Provided, That where lack of space or operating conditions prevent the proper stowage of life rafts, approved life floats may be substituted. Rafts shall not have a greater capacity than 15 persons nor a less capacity than 5 persons". 46 C.F.R. 153.2 (c) (1) (2).

3. Approved life floats and life rafts as required by the regulations were not then available and the chief inspector modified the requirements of the assistant inspector by whom the inspection was made, and authorized the tug to sail with the improvised rafts or floats. His modification of the requirement was as follows: "No. 2—Im-

provised rafts or floats will suffice until approved rafts or floats may be obtained."

4. Thereafter, improvised equipment not meeting the requirements of the regulations, but sufficient to meet the requirements of the modified order, was placed on board. The equipment required by the regulation were additional emergency life saving equipment, and were required by reason of the existence of a state of war.

5. The master of the "Menominee" was not lacking in diligence in directing the attention of the owners to the lack of equipment.

6. The tug carried as part of her permanent life saving equipment a life boat equipped to accommodate 20 persons, of the type generally in use and customarily carried on vessels of the same type.

7. No life boat drills were held nor were any special instructions given the crew with respect to launching and manning the life boat, nor was any particular attention paid to the condition of its equipment.

8. On March 30, 1942, between 4:00 and 5:00 o'clock in the afternoon, the "Menominee", towing the barges "Allegheny", "Barnegat" and "Ontario", proceeded past Cape Henry through the mine field and into the Atlantic Ocean on a voyage toward a New England port, the master having received sailing instructions and permission to proceed on the voyage from the Port Director.

9. Each of the barges was approximately 200 feet long and they were being towed in tandem on hawsers each about 200 fathoms long. Two of the barges were loaded with coal and the other with lumber.

10. The tug and tow proceeded without incident, with its lights showing, until about 2:30 a. m. on March 31, 1942. At that time it had reached a point opposite Parramore Banks Buoy and about 7 miles off-shore, when it was attacked by shell fire of a surfaced enemy submarine. The weather was calm and the moon was shining. The submarine was between the tow and the shore.

11. The first shell from the submarine which struck the tug entered the captain's quarters and the radio operator's room, disabling the ship to shore telephone and causing other damage. The master immediately sounded the general alarm and ordered the towing hawser cut, setting the three barges adrift. At about the time this was being done the tug was struck by another shell on her port bow, forward of the deck house, near the water line.

12. After cutting the towing hawser the master ordered the tug to be put about and proceeded southwardly toward the end of his tow, putting the tow between the tug and the submarine, which in the meantime was shelling the barges.

13. At the same time he ordered the chief mate to take some of the crew and try to put the life boat overboard. The mate reported his inability to launch the life boat but the master urged him to continue trying a while longer. After rounding the last of the barges the tug was headed toward shore with the purpose of reaching shallow water to escape the submarine or to beach the vessel.

14. During this time the mate and other members of the crew were vainly endeavoring to launch the life boat. As the tug approached Parramore Buoy, the submarine again attacked and one of the shells struck forward of the engine room and the vessel burst into flames. The engines of the tug were stopped and the submarine ceased firing. After the tug was stopped the mate again reported his inability to launch the life boat and the master ordered the buoyancy apparatus thrown overboard. Shortly thereafter the master was thrown from the vessel by the explosion and swam over to the buoyancy apparatus, where he found five of the crew in the water, holding to the grablines. Shortly thereafter another member of the crew joined the group, making a total of seven clinging to the buoyancy apparatus.

15. The water was very cold and within a short while the men began to suffer from exposure, becoming numb and one by one died and drifted away from the float with the exception of the chief engineer and Captain Haynie. At about dawn the two survivors were observed from the air by a patrolling plane and shortly thereafter were picked up by a vessel from a passing convoy.

16. Six other men from the tug, who had been holding on to a lattice float suffered a similar experience, only one being rescued. He died shortly after being taken aboard the rescuing vessel.

17. The crew of the "Menominee" consisted of eighteen men, including the master.

18. Serving as members of the crew were the decedents of the plaintiffs herein, namely, Edwin D. Painter, oiler, Willard Tolson Haynie, deckhand, and John Lambert Timbs, second mate. Edwin D. Painter was among those who reached the buoyancy apparatus, to which he clung for several hours before becoming exhausted when he died. Willard Tolson Haynie, who was the son of the master, went overboard after the explosion, and after calling several times for help was drowned. John Lambert Timbs, at the time of the first attack on the tug, presumably was asleep in his room back of the master's quarters and was not seen afterwards, being either killed by enemy fire or drowned.

19. The sole survivors from the tug were Captain Haynie and Chief Engineer Bateman.

20. The course followed by the "Menominee" and other tugs since the existence of a state of war up to the time of the occurrences here related, was the same as that being followed at the time of the disaster. No direct order was given the master to take this course nor was he instructed to take a different course.

21. The tug and tow could have proceeded through the inland waterway from Hampton Roads, Virginia, through the Delaware Capes, into the Atlantic Ocean, at a point far distant and beyond the scene of the disaster.

### Conclusions of Law.

The defendant was negligent in the following respects, which proximately contributed to the deaths of the plaintiffs' decedents:

1. For failure to have the flotilla blacked out at the time of the sinking;

2. For failure to have the crew trained, drilled or instructed in launching the life boat; and

3. In failing to route the flotilla through inland waters for that part of the voyage beginning at Hampton Roads and ending at the Delaware Capes.

### Judgment.

And now, to wit, this 4th day of May, 1948, judgment is hereby entered for the plaintiff, Sarah Allison Painter, as Administratrix of the Estate of Edwin D. Painter, Deceased, in the amount of $17,500, of which sum $3,500 is awarded for pain and suffering and $14,000 is awarded in payment of the pecuniary losses of the widow, Sarah Allison Painter; judgment is hereby entered for the plaintiff, Leslie F. Haynie, as Administrator of the Estate of Willard Tolson Haynie, Deceased, in the amount of $5,000, of which sum $2,500 is awarded for pain and suffering and the sum of $2,500 is awarded for the pecuniary loss of his mother, Sue Elizabeth Haynie; judgment is hereby entered for the plaintiff, Loren E. Timbs, as Administrator of the Estate of John Lambert Timbs, Deceased, in the sum of $3,500, which sum is awarded for the pecuniary loss of the mother, Alice Timbs.